Good morning, Counsel. Good morning, Your Honors. James Bowles on behalf of Appellant Time Warner Cable. May it please the Court. This is a straightforward legal issue. The jury found that my client, Time Warner Cable, did not fail to accommodate Ms. Perona. They answered Question 12 on the verdict form and said no to whether or not Time Warner Cable failed to accommodate Ms. Perona. In other words, they found that Time Warner fully accommodated Ms. Perona. Where does the word fully come from? Well, because they answered the question, and the question was, did Time Warner fail to reasonably accommodate Ms. Perona? The answer was no. As explained by the district court, that could well have meant at one point they didn't fail, but subsequently they did. I mean, neither interpretation is dictated by a question that leaves out the word either ever or always. It is dictated by the law because the continuing duty is both the duty to accommodate and to engage in the interactive process. But they are different concepts, are they not? The reasonable accommodation is part of the interactive process, but it's not the whole thing. Actually, Your Honor, it's correct. The reasonable accommodation is the end, the objective. And if you provide reasonable accommodation, if you don't fail to reasonably accommodate, then you've accomplished the objective. But as I understand Time Warner's position, you're basically saying if you have a continuum and you start at 1 and you go to 10, if Time Warner reasonably accommodates the petitioner, the appellee in this case, in time periods 1 and 2, and then stops thereafter, you said it's no problem because we accommodated her at this point. The district court takes the position that you have to continue to have this interactive process. They stopped doing it. What authority would you rely upon to suggest that that is not legally correct? Well, because the jury didn't find that we stopped doing it. I'm just saying looking at the allegations, if I understand it correctly, it is that, you know, they said you can take the time off up to a certain point. Then the supervisor says, you know, why don't you just quit and come back when you're well? She didn't do that, so they let her go. So our position is, if I understand it, hey, they did accommodate me up to point 2 in my example, but thereafter they let me go. They no longer engaged in the interactive process because there were other people who were getting part-time jobs. They didn't do that for me. Two points on that, Your Honor. First of all, the jury did not fill out anything about her termination or not granting her a continuing leave in question number 24. But we look at the entire record, do we not, in our analysis of what happened? Correct, but you have to look at the actual verdict and what the jury found, and the jury found there was no failure to accommodate. But we construe the meaning of words. No, it didn't. We did not find there was no failure to accommodate, as you're using that phrase. Your Honor, the question was, number 12, did Time Warner fail to provide reasonable accommodation for Katrina Perona's physical condition? And the answer was no. The leading case on this is the Ninth Circuit case in Watkins v. Ameripride. And the court there said, and it was applying FIA, the same statute here, the fact that Ameripride reasonably accommodated Watkins' disability forecloses his allegation that Ameripride failed to engage in the interactive process. And that was the one case after a trial. So the court found that because there was no failure to accommodate, there could not be a failure of the interactive process. Similarly, this court recently in Alamillo, as you're aware, Alamillo v. Burlington Northern held that where no accommodation is possible, that you can't engage in a violation of the interactive process. We're talking past each other because we're focusing, I mean, all I can say is the district court understands its obligation to try to harmonize the answers and gave its explanation. And its explanation turns on how to take, what to draw from the answer the jury gave on the special verdict form. And I guess I'm saying that the special verdict form, the question of whether you provide a reasonable accommodation is also an ongoing duty, just like the interactive process. And when the jury said that Time Warner did not fail to accommodate, it's ongoing duty to accommodate. And if the question had been just like you have rephrased it, we might have been able to take the answer no as being an answer to that question. But that's not the question that was on the form. But the reason the question's on the form is because that's the standard form. And so the cause of action for reasonable accommodation asks that form, asks that question on the form. That's the question they answered. And that's the question they answered, correct. And so they found there was no failure to accommodate at any time. They didn't say that. They didn't say it, but that's what the question is, because the cause of action goes to the entire period of time. When you look at the complaint, when you look at the cause of action, the jury's being asked, did Time Warner fail to accommodate Katrina Perona? Is it Time Warner's position that if Ms. Perona had been accommodated for a day and then fired, that she would have been reasonably accommodated for that day and that's it, takes care of everything? No. That is not our position. What's the difference here other than the amount of time involved? Our position is that the jury looks at the entire period of time and answers the question. On what do you base that? Because that's what the cause of action is. That's what the jury instructions are. And that's what the verdict form is. So all of the cause of action doesn't ask, hey, did you accommodate her for some period of time? The question was, their allegation is that Time Warner failed to accommodate her disability, and the jury said no on that. But, counsel, again, as my colleague said, I think we're kind of talking past each other. You put everything on the reasonable accommodation. It seems to me, based on the cases and the facts here, yeah, Time Warner did reasonably accommodate her to a certain point. The question is, what does the concept mean to failure to engage in the interactive process? Does that have no meaning? No, it does have meaning, but where an accommodation is provided and where the company does not fail to accommodate the disability. At what point, though? At any point. So you get back to my earlier example, accommodate for one day, then fire her, that's okay. If that had occurred, the jury would have said, you did not fail to accommodate her. In this case, the jury said, no, you did not fail to accommodate. Okay, so the point is that the case law has said. This was argued to the district court, wasn't it? Yes, Your Honor, it was. What the district court reasoned was the following, which you've alluded to, that under Swanson v. Morongo, the duty to engage in the interactive process is ongoing. Right. But what we pointed out is, so is the duty to accommodate. So if the jury found there was no failure to accommodate, then it can't have found that the interactive process broke down because the accommodation is the object of the process. The process is supposed to result in reasonable accommodation. The jury found that Time Warner reasonably accommodated Ms. Perona. And I'd like to get to the evidentiary, I mean the essence of the facts. The jury in question number 24 on the verdict form said two things that could have been done during the interactive process. Change the work schedule to part-time shift and reassignment to a vacant shift or a vacant position. But neither of these could have been accomplished because Ms. Perona, by her own statements, and if you'll look at the record, 263 to 268 of the excerpts of the record, Ms. Perona says that she required to work a morning shift. She wanted to work only a morning shift and she refused any other shift. And she refused to reapply because, remember, Time Warner told her at the time that they terminated her, as soon as you get better, come on back and we'll put you into the next class. And that's why the jury found there was no failure to accommodate her. And yet she didn't reapply. Why? Because she said she didn't reapply because she did not want to work an afternoon shift. She would only work a morning shift. Let me ask you this, counsel. You agree, I gather, that the doctor said it's okay for her to come back, but she should only work part-time. What did the doctor say about the time of day? He said specifically, and this is in the doctor's order, Exhibit 8, excerpts of the record 330, must work a morning shift. And that's what Time Warner had. That's the only thing Time Warner had from the doctor in the case law. But I thought you said she said the same thing. She wanted to work a morning shift, right? The doctor said she must work a morning shift. She said I want to work a morning shift. I must work a morning shift. But no morning shift was available because. But, counsel, that's what reasonable accommodation is all about. Your Honor, but U.S. Airways versus Barnett says that you can have a seniority system. The evidence was that there were 300 people. She applied for a job and she's told you've got to work a night shift because there's 300 people in front of you that have greater seniority. Are there other people that have physical disabilities to which this act applies? I'm sorry, which act? In other words, she wants a reasonable accommodation because she has a disability. Correct. Okay. So are these 300 people all people who have made application for reasonable accommodation? No, they're not. But under Barnett, U.S. Airways versus Barnett, a seniority system where employees are given a preference for shift or any other preference because of seniority has to be followed, not a reasonable accommodation. Okay. So the reason that there were other people who had these part-time shifts and she didn't get one is because of seniority based on some union deal or something else. Well, because they could get the shift within their period of time. They had the seniority. Correct. Correct. So what she said was I will only work a morning shift and there were no morning shifts available. And the same thing with a vacant position. There were no vacant positions available that didn't have the seniority system, the same seniority system. Do you have, is it a union or what is it that sets up the seniority? No, it's actually, and it doesn't matter because the case law says that an informal system that's announced to the employees at the start of their employment and that. And how is that kept track of? The day you check in it's like we have a commission and the seniority runs from that. Is that what it is? They run a shift bid once a year and it's just based on your seniority date. So you get the first bid. Kind of like the airlines. Right. And you go through that first 300 people were all ahead of her and so they took the morning shifts and so she couldn't get a morning shift. So your defense is, hey, we couldn't do this because of the seniority system. Correct. And you rely on that case, right? Correct. Barnett, yes. And the jury so found. The jury found that we did not terminate her improperly. There was no wrongful termination, there was no discrimination, there was no retaliation. We won nine out of ten of the causes of action. The only cause of action that they hung up on was this failure to engage in the reasonable, in the interactive process. And they were talking about change of a work shift to a part-time shift, but she only would accept a morning shift and that wasn't available. And she also said, the jury said, reassignment to a vacant position and there were no vacant positions that weren't covered by this seniority system. Do you want to save any of your time? It's entirely up to you. Yes, I will. Thank you, Your Honor. Thank you. Good morning, Your Honor. Good morning. May it please the Court, Frank Mignano on behalf of Plaintiff Katrina Perona. The major flaw in Time Warner's argument on appeal is that they're attempting to reconcile the verdict, but they're reconciling it in their favor. They're making all of the inferences and assumptions in their favor, rather than looking at the evidence that was presented to the jury and interpreting it in the light most favorable to the plaintiff. Let's assume, arguendo, that we agree with your interpretation of reasonable accommodation versus the failure to engage in the interactive process. How do you respond to counsel's argument that the jury suggested two ways in which she could have been further accommodated in the interactive process, but that neither of those was available based on the seniority system? What's your response to that? Well, Your Honor, the evidence at trial with regard to the change in work schedule part time, which is the first thing that the jury wrote down, Time Warner wants to focus on their shift bid. However, looking at the evidence in the light most favorable to Ms. Perona, the evidence at trial was contradictory. When we had the Time Warner employees, and this is in our brief, but when we had the Time Warner employees on direct examination, no one had a handle on what the shift bid process was. As counsel pointed out, there is no written policy on the shift bid. There's nothing that indicates to the employees how this shift bid purportedly works. The shift bid wasn't even identified by Ms. Long, who is the human resources person, who denied Ms. Perona's return to work. So there's nothing in the record that would make it a clear cut finding that this shift bid applied. So with regard to a part time morning shift, they could have accommodated her, if we looked at the evidence in the light most favorable to Ms. Perona. On the other hand, even if we don't look at a morning shift, the testimony by Ms. Perona and her doctors was that she could have worked in an afternoon shift. And that's in the record. She could have tried. She could have tried. And as Your Honor pointed out, that's exactly what the interactive process is about. And that was the major failure in this case. But in terms of the record where the doctors testified in that regard, it's pages 850 through 855. So I believe ---- How about where she testified? Because she testified at one point, and I haven't found it yet, but I saw it before, that she thought the doctor had told her it had to be morning. Ms. Perona did acknowledge on examination by counsel that that's what her doctor's note said. The doctor's note said must work in the morning. When she was pressed on that, if you look at the testimony that's cited in the record, what she said was, sure, that was better for me. Given my medical condition, working in the morning was better for me. But that didn't ---- she didn't testify in a manner that precluded any other time that she would be able to work. Ms. Perona wanted to return to work. That was the whole purpose. Well, she was asked specifically about an evening shift, and I thought she said pretty specifically she wasn't interested in that. I don't know if she was recalled to ask specifically about an afternoon shift in the part that I read, but she did seem to say, I had morning. That was best for me. I wouldn't want to change away from that. So does she say at some point she's willing to take an afternoon shift? She said she would have considered it, Your Honor. And you're correct in that there's two different issues that are being combined here. The evening shift that she was transferred to started at 10 p.m., I believe. And that was just a no-go for her. She was unable to do that, and that's what started the entire leave. But with regard to working the shift that she was in, starting at 1 o'clock, that was certainly something she would have been able to consider, and she would have considered it, and it was certainly approved or would have been approved by her doctors, and her medical expert testified the same way. With regard to a vacant position, Time Warner Cable is trying to pigeonhole the accommodation in the July time frame when Ms. Perona tried to return to work. Well, first of all, she could have gone back to her own position at that time. But if we go to the end, you know, if we're just looking at reassignment to a vacant position, there was a vacant position, number one, with her own position. Her own position, and again this is in the brief, remained open the entire time she was out and wasn't filled until after she was terminated. So she could have returned to that position. We also elicited testimony from Ms. Long, who's the HR representative and who was in charge of the hiring process at that facility, that there was a constant revolving door of new employees. There were new classes, and in fact, in the record, there was a class in December of that year. So just a month before they terminated her, they knew another class was coming up and she could have been placed in that class. So, again, looking at the record in light most favorable to Ms. Perona, Judge Fitzgerald properly reconciled the verdict and upheld it. I'm still trying to restore what you said there at the end. She could have been placed in the new class in December, but would that have led to the position that she preferred, that is, the morning part-time shift? Because if, as I, I mean, I'm going back and forth, but under the bid system, if she comes in in a new class in December, her seniority is certainly not going to be any better than it was already, and I thought it was said at one point that the problem is that there are other people in front of you in line and we can't let you jump the line, so that's why you can't have the shift you want. Well, would she have been able to get an absolute morning shift? We don't know that because it was never investigated by Time Warner at the time. But don't forget also that she had now been there for at least a year, and so she would have had seniority over the new people in that class, and she may have been able to get an earlier shift, maybe not a morning shift. Do you know if anybody from that class was placed in a morning shift? I don't know that, Your Honor. I think other than that, Your Honor, unless there are certain questions that the Court has. Other questions by my colleague? If none, thank you very much. Thank you. So Time Warner has some rebuttal time. Yes. Thank you. Thank you, Your Honor. Again, on the seniority system, the testimony, and we cited it in the brief, was that there were no exceptions to the seniority system, that it was an ironclad system and there were no exceptions. On the morning shift, again, Exhibit 8, which was Dr. Goodloe's note, doctor's orders, you've got to follow the doctor's orders, the case law says this. Well, there's also testimony, I think, from him that he would have encouraged her to work and that could have included an afternoon shift. I understand that. But from the employer's perspective, what's offered to them is the doctor's order. And the case law under Hansen, and there's other cases, specifically says that the employer must follow the doctor's orders. And it basically says, in Hansen, that the employer is obligated to follow the doctor's orders. Now, in addition to the doctor's orders, there's also the case law,  the point that there was no, that the seniority precluded her being placed in a warning position. The court does say that she would be willing to talk about the evidence that said she would try to work in an afternoon position. Right. I'm not sure the district court fully dealt with that, Your Honor. I'm just wondering, was it presented to the district court? Yes, of course. And the district court gave the Barnett instruction on seniority that we were entitled to, that Time Warner was entitled to rely on the seniority system. But Dr. Goodloe's note, Exhibit 8, said, must work in the morning. And Time Warner was entitled to rely on that. That's what the case law says. Hansen v. Lucky Stores and the other cases say we're entitled to rely on that. That's what we knew. That's what Time Warner knew. And it was following that. Now, she says she could have returned to her own position. That seniority system is still in place. There's still 300 people in front of her. So she would not have been able to return to her position. As soon as she quit, that was closed. She couldn't have gone back, right? No, because Ann Long told her, and this was part of the reason the jury did not find a failure to accommodate. Ann Long, the HR person, and this was in the termination letter, said, you can reapply. And Ann Long testified, I will put you back into the next class. You know, as soon as you get better and can come back to work, I'll green light you and put you in the next class. That is a reasonable accommodation. That's like giving an open-ended leave to the person and allowing them to come back. So there was reasonable accommodation. Other questions by my colleague? All right. Thanks to both counsel. We appreciate it. The case just argued is submitted.
judges: Schroeder, Clifton, M. Smith